In re John David HALL, Debtor.

No. 05–52701.

United States Bankruptcy Court,
W.D. Kentucky,
Paducah Division.

July 31, 2006.

M. Greg Rains, Paducah, KY, for Debtor.

## MEMORANDUM OPINION

THOMAS H. FULTON, Bankruptcy Judge.

THIS CORE PROCEEDING[1] comes before the Court on the Creditor Elizabeth Goodchild's ("Creditor") Objection to Confirmation. The Debtor filed for Chapter 13 bankruptcy protection on December 23, 2005. An Amended Chapter 13 Plan was filed on January 6, 2006, to which the Creditor files the current objection pursuant to 11 U.S.C. § 1325(a)(3), (a)(6), and (a)(7) and 11 U.S.C. § 1307. The Chapter 13 Trustee, Charles Sydenstricker ("Chapter 13 Trustee"), also objected to confirmation, stating that the Debtor did not propose to pay the minimum amount into the plan as required by 11 U.S.C. § 1325(b)(1) and, thus, the Amended Chapter 13 Plan could not be confirmed as a matter of law.

An evidentiary hearing was held on April 18, 2006, at which all parties appeared, and the Debtor testified before

---

1. *See* 28 U.S.C. § 157(b)(2)(L).

this Court. Following the hearing, the parties were given additional time to file post-trial briefs, and the Debtor filed two amended Chapter 13 plans, after which this Court took the matter under submission. Based on the statements of counsel, the testimony of the Debtor, and the entire record in this case, the Court orders that the Debtor's Chapter 13 bankruptcy be DISMISSED WITH PREJUDICE for a period of one year.

## FINDINGS OF FACT

### Procedural Background

The Debtor filed for Chapter 13 bankruptcy protection on December 23, 2005. At the time, he listed secured debts of $270,954.00, and unsecured nonpriority debts of $223,269.00. Five creditors filed claims, (1) a secured claim by Ford Motor Credit for a Ford Focus for $10,198.96, which the Debtor proposed to pay through his Chapter 13 plan; (2) an unsecured claim by Ameritech Publishing for $35,000.00, which the Debtor states was discharged in a previous Chapter 7; (3) an unsecured claim by General Motors Acceptance Corporation, which has since been resolved; (4) a unsecured claim by Synergy Law Group for $30,000.00, for which the Debtors contends he is not personally liable; and (5) a judgment claim by the Creditor for $135,221.00, which the Debtor is currently appealing in Illinois State Court. According to the Debtor, his only debts are the secured claim to Ford Motor Credit and the unsecured claim to the Creditor. The Debtor testified that his filing for Chapter 13 bankruptcy protection was precipitated by the efforts of the Creditor to collect on her judgment, including garnishing the Debtors bank accounts.

Debtor's Schedule I listed income of $5,127.00, which consisted of his monthly salary from InterMLS, the Debtor's business, as well as the pension he receives from the Chicago Firefighters Pension Union Disability Fund. On his Amended Schedule J,[2] the Debtor listed monthly expenses of $5,425.00. Among his expenses, the Debtor listed a monthly mortgage payment of $1,811.00, monthly food expenses of $645.00, and clothing expenses of $160.00 per month. Based on the income and expenses listed in his Chapter 13 Schedules, the Debtor had negative $928 a month in disposable income. The Debtor filed a Chapter 13 plan ("Initial Plan") contemporaneously with his Chapter 13 petition. The Initial Plan called for no monthly payments, and consisted solely of a payment of $1,275.00 to the Trustee upon confirmation, plus recovered preferences from the Creditor totaling $26,615.57.

The Debtor filed a First Amended Chapter 13 plan ("Amended Plan") on January 6, 2006. The Amended Plan consisted of payments of $50.00 per month for twelve months, followed by payments of $100.00 per month for 48 months. Additionally, the Amended Plan called for a payment of $1,275.00 upon confirmation plus an anticipated recovered preference from the Creditor in the amount of $17,053.00. The Creditor filed an Objection to Confirmation of Plan under 11 U.S.C. § 1325(a)(3), (a)(6), and (a)(7), which is presently before this court. An Evidentiary Hearing was held on April 18, 2006, at which the Debtor testified.

Following the Evidentiary Hearing, the Debtor filed two additional amended Chapter 13 Plans. The Creditor and the Chapter 13 Trustee objected to both amended

---

**2.** The Debtor filed his amended Schedule J on December 23, 2005, the same day as his initial Chapter 13 bankruptcy filing. The Schedule J filed with his Schedules listed monthly expenses of $6055.00 a month.

Chapter 13 plans on similar grounds to their objections to the Amended Plan.

**Factual Background**

The Debtor was married to Ellisa Hall before their marriage ended in divorce in March 2005. During their marriage, the Debtor was made legal guardian of Ellisa's two sons, Jacob, age 17, and Paul Henry, who has since reached the age of majority. The couple also had a son, Adam, age 5. During their marriage, the Debtor and Ellisa formed Amerihall of Illinois, LLC, a franchise of the real estate company RE/MAX. The Debtor owned 58% of Amerihall, and Ellisa owned the remaining 42%. The Debtor served as Amerihall's real estate broker, and Ellisa provided office services, including bookkeeping, clerical, and database entry duties.

According to the Debtor, the Debtor and Ellisa suffered serious marital problems stemming from Ellisa's drug and alcohol addictions. The couple moved to Kentucky in 2004 to a dry county in the Debtor's efforts to keep Ellisa sober. They continued to operate Amerihall during this time. Ellisa, however, was unable to maintain her sobriety and the Debtor ceased operations of Amerihall. The Debtor testified that he could not continue to operate the business because Ellisa was half owner and she could not be trusted. The Debtor stated that Elissa had been taking money from the company account for her personal use. Ellisa was arrested on a domestic violence charge against the Debtor on November 10, 2004, and was ordered to stay away from the Debtor pending resolution for the matter. Ellisa was convicted and incarcerated based upon these charges. The Debtor subsequently filed for divorce in early 2005, and a separation agreement was approved by the court on March 22, 2005. In the separation agreement, the Debtor was awarded the marital home as well as custody of the children Jacob and Adam. Pursuant to the Separation Agreement, Ellisa quitclaimed her interest in the marital home to the Debtor on July 29, 2005. Following her release from jail, Elissa entered drug and alcohol rehabilitation to address her various addictions.

On September 12, 2005, the Creditor obtained a judgement against the Debtor in the amount of $135,221.00. The Creditor proceeded to garnish both the bank accounts of Amerihall, essentially putting it out of business, and a savings account earmarked for the Debtor's son. On September 27, 2005, the Debtor quitclaimed the home he received pursuant to the Settlement Agreement back to Elissa. The Debtor testified that this transfer was the result of a continuing negotiation with Elissa regarding their Separation Agreement. The Debtor testified that following Ellisa's rehabilitation she began to complain that she did not receive adequate property in their Settlement Agreement. Debtor stated that Elissa began to threaten to seek custody of the children unless he renegotiated their Settlement Agreement. The Debtor stated that these negotiations began over the summer of 2005 and resulted in an Agreed Order entered in October 2005. Prior to filing the Agreed Order with the State Court, the Debtor transferred his home to Elissa for no consideration. The Debtor testified that the judgment and the collection actions by the Debtor had no impact on his decision to transfer the home, and that it was only coincidental that he transferred his largest single asset to Elissa two weeks after the judgment was entered and soon after the Creditor began her collection actions. The Debtor also claims that the bank account garnished by the Creditor was earmarked for his son's college education, which was similarly the result of his negotiations with Elissa regarding their

Separation Agreement. The Debtor and Elissa filed a Recommended Agreed Order ("Agreed Order") on October 13, 2005, with the State Court to amend the Separation Agreement on. In the Agreed Order the Debtor agreed to quitclaim the martial home back to Ellisa, who would then be responsible for maintaining the monthly mortgage payments on the home. The Agreed Order further stated that Ellisa would receive Amerihall of Illinois LLC, and that $25,000.00 was to be earmarked in a savings account for their son Adam for his college education. Although not set forth in the Agreed Order, the Debtor testified that he and Ellisa orally agreed that he could continue to live in the house and would pay the mortgage of $1,811.00 per month. The Agreed Order was entered with the Illinois State Court over a month after the Creditor received her judgment.

Following his relocation to Kentucky, the Debtor began to operate InterMLS, which was incorporated in August 2003. InterMLS is a service provider designed to aid real estate agents in marketing homes listed for sale. InterMLS replaced Amerihall as the Debtor's major source of income. According to Debtor, InterMLS struggled at its inception and has only begun to make a profit in the last year. The Debtor refinanced his home in July, prior to quitclaiming it to Ellisa, to provide start-up capital for InterMLS. While operating InterMLS, the Debtor initially received a salary of $5,000.00 per month, which subsequently raised to $6,000.00 per month. In November of 2005, the Debtor hired Ellisa to do general office work, for which she received $3,000.00 a month gross. The hiring of Ellisa resulted in the Debtor's salary dropping from $6,000.00 a month to $3,000.00 a month. The Debtor testified that he needed office assistance and that Ellisa works an average of 50 hours a week doing various bookkeeping,

secretarial and office work. The Debtor further testified, however, that he is unsure of where Ellisa currently resides and that she "comes and goes ... [she is] not very dependable on where she's going to be at any one time. It's the problem that we have." The Debtor further testified that he was unsure if Ellisa was stable or if she is sober, stating,

I believe she's trying, very hard; but if you've ever lived with an addict, you know, one thing they do is just lie about everything, They can't tell the truth ... You can't trust them, but she's the mother of my children. You—I can't trust her. I haven't been able to live a day of trust since the day I met her.

As stated previously, the Debtor testified that in the past Ellisa took money from Amerihall for her own personal use. Despite this distrust and Ellisa's past history, the Debtor employs Ellisa to do his bookkeeping and manage his office.

**Post–Hearing Developments**

At the Hearing on April 25, 2006, the Court entered an order giving the Debtor until May 9, 2006, to file a supplemental brief, and the Creditor was given 10 days thereafter to file a response, at which time the Court would take the matter under submission.

The Debtor filed Amended Schedules A, C, I and J on April 26, 2006. Debtor's Amended Schedule J listed Real Property, consisting of the home in which Debtor was residing, owed in fee simple and valued at $255,000.00, with a secured claim of $241,350.00. This change in Schedule J was the result of Ellisa quitclaiming her interest in the house back to the Debtor for consideration of $1.00. Debtor's Amended Schedule C listed an exemption in the real property in the amount of $13,650.00. Debtor's Amended Schedule I listed income of $5,127.00 per month, and

his Amended Schedule J listed expenses of $4,666.00 per month, resulting in disposable monthly income of $461.00 per month. The Debtor's initial Schedule J listed his mortgage payment as $1,811.00 per month, and his Amended Schedule J listed the mortgage payment as $1,513.97 per month. The Debtor's accompanying Brief in Support of Confirmation states, however, that the mortgage payment remains $1,811.00 per month. While the Court appreciates the Debtor's attempts to reduce his monthly expenses, misstating his monthly mortgage payment in an effort to devise a plan which this Court could confirm is not an appropriate way to reach this goal. Based on the statements within the Debtors Brief in Support of Confirmation, this Court must find that Debtor's disposable income is actually $163.97. Debtor also filed an Amended Chapter 13 Plan[3] ("Second Amended Plan").

In his Second Amended Plan, the Debtor proposed paying $475.00 per month for sixty months. In his Brief in Support of Confirmation, the Debtor stated that his plan was proposed in good faith and he was willing to have his plan reviewed annually to account for any substantial changes in income. Debtor further states that his plan is feasible. The Creditor filed an Objection to the Debtor's Second Amended Plan on the same grounds as the Objection to the Confirmation of the Debtor's First Amended Plan.

The Debtor filed yet another amended plan on June 28, 2006 ("Third Amended Plan"), in which he proposed to pay $825.00 per month for 60 months. The Debtor failed, however, to file an amended Schedule I or J. A confirmation hearing on this plan was held July 19, 2006, at which time the Court questioned the Debtor on how he would fund this plan. The Debtor's attorney could not provide this Court with a satisfactory answer to that question and simply stated that the Debtor would come up with the money. The Creditor and the Chapter 13 Trustee objected to confirmation of the Third Amended Plan on the grounds that it was not feasible. The Court took the matter under submission. On July 20, 2006, the Debtor filed amended Schedules I and J. Although Debtor's Schedule J did not change, the Debtor stated that he had "found a tenant" to rent a portion of his home for $350 a month. According to the Debtor's schedules, he now has $826 a month to pay into his Chapter 13 plan.[4]

## CONCLUSIONS OF LAW

The Creditor Objects to Confirmation of the Debtors Second Amended Plan under 11 U.S.C. § 1325(a)(3), (a)(6), and (a)(7) and 11 U.S.C. § 1307.

11 U.S.C. § 1325 sets forth the requirements for a Chapter 13 plan to be confirmed. The Creditor alleges that the Debtors cannot make all the payments proposed under the plan as required by § 1325(a)(3), the plan were not filed in good faith as required by 1325(a)(6), and the petition was not filed in good faith, as required under § 1325(a)(7) and § 1307(c)

■ Among the many changes made to the Bankruptcy Code by the BAPCPA was the addition of 11 U.S.C. § 1325(a)(7). Under § 1325(a)(7), a court may deny confirmation of a Chapter 13 plan if it finds

---

**3.** The Debtor lists this Plan as his First Amended Chapter 13 Plan, but it is actually his Second Amended Chapter 13 plan. The Debtor previously filed an Amended Chapter 13 Plan on January 6, 2006.

**4.** It should be noted that Debtor's schedules still reflect a misstatement of the Debtor's mortgage payment, and, including the added income, Debtor's disposable income is actually only $513.97 a month.

that the *petition* was not filed in good faith. Although no Sixth Circuit court has yet addressed the application of this provision, commentators have suggested that by finding that a Court may deny confirmation of a plan if the petition was not filed in good faith, "Congress has presumably indicated that denial of confirmation, rather than dismissal, is the appropriate way" to prevent bad faith filings. *Collier on Bankruptcy* 15th Ed. Rev. 8–13205, ¶ 1325.07A. It, therefore, appears that the insertion of § 1325(a)(7) is meant to provide courts with an alternative to the harsh dismissal called for under § 1307(c) if the Court finds that a petition was not filed in good faith. The Court, therefore, feels that it is appropriate to draw guidance from previous Sixth Circuit precedent addressing § 1307(c) in examining § 1325(a)(7). If this Court finds that a petition was not filed in good faith, it will then consider, based on the particular facts and circumstances presented, if the appropriate remedy is dismissal under § 1307(c), or the less harsh remedy of denial of confirmation under § 1325(a)(7). This Court additionally notes that the good faith standard for § 1325(a)(3) and § 1307(c) is identical, although the provisions address good faith in relation to the proposal of a Chapter 13 plan versus good faith filing of a Chapter 13 bankruptcy petition. As the basic standard is the same, this Court will set forth what is "good faith" under the bankruptcy code. The Court will then apply this standard to the particular facts and circumstances of this case, and determine which of the available remedies, if any, are appropriate.

■ Although "good faith" is not defined in the Bankruptcy Code, the Sixth Circuit has developed a test that requires consideration of the "totality of the circumstances." *In re Alt*, 305 F.3d 413, 419 (6th Cir.2002); *In re Barrett*, 964 F.2d 588, 591 (6th Cir.1992). In reaching this determination, the Court should look to a list of non-exhaustive factors including: (1) the debtor's income; (2) the debtor's living expenses; (3) the debtor's attorney's fees; (4) the expected duration of the Chapter 13 plan; (5) the debtor's sincerity in seeking Chapter 13 relief; (6) the debtor's future earnings potential; (7) any special circumstances, such as medical expenses; (8) the frequency with which the debtor has sought bankruptcy relief; (9) the circumstances under which the debt was incurred; (10) the amount the debtor offered to pay as an indicator of sincerity to repay the debt; (11) the trustee's burden in administering the plan; and (12) statutory policy that bankruptcy provisions be construed liberally in favor of the debtor. *In re Alt*, 305 F.3d at 419, applying the good faith standard under § 1307(c); *In re Barrett*, 964 F.2d at 592 (6th Cir.1992), applying the good faith standard under § 1325(a)(3). These factors are a starting point, and a court should consider the particular facts and circumstances present in an individual case when making a good faith determination. *In re Alt*, 305 F.3d at 419.

■ Applying the Sixth Circuit precedent to the facts and circumstances to the present case, it is apparent that the Debtor has not acted with good faith in his dealings with the Court. As set forth in the Findings of Facts above, the Debtor has provided this Court with an often conflicting story that leads this court to a finding that the Debtor is not acting with good faith in regards to either his petition or his plan. Although the factors to be considered set forth above are not exhaustive, they give the Court a starting point and a useful guide in analyzing the Debtor's actions.

The first element the Court is directed to consider is the Debtor's income. The

Debtor's income dropped from $8,127.00 to $5,127.00 in the month prior to his filing for bankruptcy. The Debtor claims that this decrease in salary was the result of having to hire someone to assist in the office. The Debtor further stated that he hired his ex-wife Ellisa to fill this role because she was familiar with how the business was run, she needed the job, and he felt a responsibility to her because she was the mother of his children. The Debtor also testified, however, that Ellisa was an unstable alcoholic who could not be trusted and had stolen from his past businesses. Further, the Debtor testified that Ellisa worked fifty hours a week, but at the same time he claimed she was unreliable and he did not know where she lived. This Court cannot find that the Debtor's actions or statements regarding his income were forthcoming and honest when the Debtor presents such contradictory statements and the timing of when he hired his ex-wife was in such close proximity to his Chapter 13 filing.

Next the Court is instructed to consider the Debtor's living expenses. The Debtor has filed several revised Schedule J Expense Statements. The Court acknowledges that expenses can fluctuate over time and will only address the most recent Schedule J filed by the Debtor. The Debtor lists a monthly mortgage payment of $1,514.00, although the Debtor admitted in his Brief in Support of Confirmation that he was actually paying $1,811.00 per month. The Court advised the Debtor at the evidentiary hearing that his mortgage payment was high and that alternative housing was likely available that would be more than adequate for him and his children at a lower rate. The Debtor did not seek more affordable housing, however, but merely lowered the amount listed on his Schedule J despite the fact that the monthly mortgage payment is still $1,811.00. In his brief supporting confir-

mation, the Debtor also stated that certain expenses would decrease due to his stepson enlisting in the Army following his high school graduation this spring. Following the stepson moving out, only the Debtor and his son Adam will live at home with expenses estimated at $500.00 for food, $412.00 for medical and dental expenses, $188.00 for telephone, and $815.00 per month for auto payments, insurance and taxes. Although the Court does not find that the Debtor has unduly inflated his expenses, there is still some areas where the Debtor could decrease costs in an effort to repay Creditor.

The next relevant consideration is the Debtor's future earnings potential. The Debtor is self-employed and testified that he is confident his business will grow and, as a result, his income will increase. While the Court appreciates the Debtor's confidence, he admitted that his business was a departure from traditional real estate ventures. As such, its chances of survival are far from assured. Therefore, while this Court does not doubt that the Debtor feels his business will flourish, it is also aware that this employment is not as stable as traditional employment.

The Debtor has sought bankruptcy once before. He filed a Chapter 7 bankruptcy petition in the Northern District of Illinois in 2003, for which he received a discharge.

The Debtor's present bankruptcy was precipitated by a single unsecured debt, which is owed to the Creditor. The Creditor received a judgment against the Debtor in Illinois State Court on September 12, 2005. The Debtor is currently appealing the judgment. Following the judgment, the Creditor seized the Debtor's bank account, which the Debtor testified was earmarked for his son's college education, and the bank account of Amerihall, Inc. It is evident that the Creditor would have con-

tinued to seize the Debtor's assets, but two weeks following the judgment, on September 27, 2005, the Debtor quitclaimed his home to Ellisa Hall. The Debtor testified that he did this as part of a pre-existing negotiation with Ellisa in regards to their divorce settlement. The Court cannot, however, ignore the close proximity in time to the judgment being entered against the Debtor and the Debtor quitclaiming his home, his largest single asset, to his ex-wife. Further, the Agreed Order filed by the Debtor and Elissa was not filed with the State Court until October 13, 2005, *after* the Judgment was entered and *after* the home was transferred.

The Debtor testified before this Court that his actions in hiring Elissa and transferring his home to her while continuing to live in it and pay the mortgage on it was motivated not by the actions of the Creditor, but by a need to protect his children and help out their mother. While the Court does not question the Debtor's love for his children, it did not find his testimony to be forthright. The Debtor's sworn testimony before this Court was fraught with inconsistencies and half-truths. The Debtor stated that Elissa was an unstable alcoholic who could not be trusted. Despite this knowledge, he claimed he was worried a court would grant her custody. He also stated that Elissa stole from his previous business and was unreliable. He now claims, however, that she is an asset to his business and is working fifty hours a week. He transferred his home to her, although he admitted she could not pay the mortgage and had no stable source of income aside from the $3,000.00 a month he is paying her to help out at the office. The Court also finds it questionable that the Debtor hired Ellisa to work for him, caus-

ing his salary to decrease by 50%, *immediately* prior to filing for bankruptcy. While these actions may, in isolation, be credible, when taken together the Court can only conclude that the Debtor is using his family problems as a cover to prevent paying this Creditor.[5]

This belief is further reinforced by the plan submitted by the Debtor. Debtor's First Amended Plan called for the Debtor to pay $50.00 a month for twelve months, followed by $100.00 a month for the next 48 months. In addition, the Debtor proposed to pay $1,275.00 to the Chapter 13 Trustee upon confirmation, plus a recovered preference from the Creditor in the amount of $17,053.00. The Debtor listed three priority claims, the Trustee's commission, his bankruptcy attorney, and Kurt Richtor, his attorney hired to pursue the Illinois appeal of the Creditor's judgment. According to the Debtor, after payment of administrative expense claims, only the Creditor's claim is at issue. The likely result of this is that there would be no, or virtually no, money available the Creditor following the payment of Administrative Expense Claims. Therefore, if the Debtor failed to have the Creditor's judgment overturned, Mr. Richtor, who is pursuing the appeal, would receive payment before the Creditor.

The Debtor filed a Second Amended Plan on April 26, 2006, the day after the confirmation hearing. In this plan, the Debtor proposes to pay $475.00 a month for 60 months. In his brief supporting confirmation, however, the Debtor stated that this was not a true indication of his disposable income, because he artificially lowered his mortgage payments by $297.00 a month. According to the Debtor's actual expenses, he only has $164.00 per month in

---

5. It should be noted that on April 26, 2006, Elissa Hall quitclaimed her interest in the home back to the Debtor.

disposable income to pay into his plan. Under the recently enacted BAPCPA, if a debtor's income is more than the applicable state's median income then required payments to unsecured creditors are determined by using the means test set forth in 11 U.S.C. 707(b)(2)(A) and (B). 11 U.S.C. § 1325(b)(2) and (3); *See also, Collier on Bankruptcy*, 8–1325, ¶ 1325.08 (15th Rev. Ed.2006). Based upon the means test, the Debtor's income is more than the state's median income, and his payments into his Chapter 13 plan must be $49,474.20 as a matter of law. Under the Debtor's Second Amended Plan, he proposes to pay only $28,500.00, well below the amount required under the BAPCPA. A Confirmation Hearing was held on the Second Amended Plan on June 21, 2006. At that time the Court shared its concerns about the Second Amended Plan with the Debtor. The Court informed the Debtor that it would not approve the Second Amended Plan, and told him that he would be permitted to file yet another Chapter 13 plan.

The Debtor filed a new Chapter Plan 13 ("Third Amended Plan") on June 29, 2006. The Third Amended Plan proposes to pay $825.00 a month for 60 months, totaling $49,500.00. The Debtor did *not* file amended Schedules I and J setting forth an updated listing of his income and expenses prior to the Court taking this matter under submission. Therefore, as stated above, the Debtor claims an income of $5,127.00 and has expenses of $4,963.00, resulting in disposable income of $164.00. While the Debtor's Third Amended Plan may technically comply with the requirements of 11 U.S.C. § 1325(b)(2) and (3), it is clearly not feasible. The Debtor's

Schedule I and J show that he has $164.00 a month in disposable income, yet he proposes to pay $825.00 a month into his Chapter 13 plan, meaning he is planning on paying $661 a month *more* than his disposable income into the plan each month.[6] The only conclusion that the Court can logically reach at this point is that the Debtor is merely inserting numbers into his plan that would technically allow his plan to be confirmed. The Debtor has appeared before this Court on four separate occasions, and the Court has attempted to give the Debtor the benefit of the doubt. The pattern of dealings, however, can only lead to the conclusion that the Debtor has been less the truthful with this Court. Bankruptcy is meant to aid the honest but unfortunate debtor in obtaining a fresh start. Is not a device to weasel your way out of obligations and waste the time of this Court. According to his Schedules, the Debtor will not be able to make the proposed payments. If the Debtor is able to make these proposed Chapter 13 payments, his schedules, which were signed under penalty of perjury, are false. Either way, this Court cannot confirm the Debtor's Third Amended Plan.

Based on the lack of forthrightness by the Debtor, his purposeful diminution of his assets as well as his proposal of a plan that, according to the Debtor's own Schedules is not feasible, this Court cannot find that the Debtor submitted either his Plans or Petition in good faith. Taking into consideration the entire record in this case, including the testimony of the Debtor and the multiple Chapter 13 plans that were filed, this Court feels that this is an appro-

---

**6.** The Debtor claims that he now has a tenant that will allow him to pay another $350 a month into the plan. The amended schedules were filed after the matter was taken under submission and will not be considered by this Court. This Court has allowed the Debtor numerous opportunities, and, as it is now seven months after the Debtor filed his bankruptcy petition, the Debtor is simply a day late and a few dollars too short.

priate case for dismissal under 11 U.S.C. 1307(c).

IT IS THEREFORE ORDERED, AD-JUDGED AND DECREED that the Debtor's Chapter 13 Bankruptcy petition be DISMISSED WITH PREJUDICE for a period of one year.

A separate Order consistent with the foregoing has been entered in accordance with the Federal Rules of Bankruptcy Procedure 9021.